**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

INTELOMETRY, INC., a Texas corporation,

　　　　　　　　　　　　　Plaintiff,

v.

CALPINE ENERGY SOLUTIONS, LLC, a California limited liability company,

　　　　　　　　　　　　　Defendant.

Case No.: 25cv2796 DMS (BLM)

**ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION; DENYING DEFENDANT'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF ITS SUR-REPLY; SETTING DEADLINE FOR DEFENDANT'S RESPONSIVE PLEADING**

**[ECF Nos. 24, 45]**

Pending before the Court is Plaintiff Intelometry, Inc.'s motion for preliminary injunction. (ECF No. 24; Mem. P. & A. ("MPA"), ECF No. 26.) Defendant Calpine Energy Solutions, LLC filed a response in opposition. (Opp'n, ECF No. 28.) Plaintiff filed a reply. (Reply, ECF No. 38.) Defendant filed a sur-reply, (Sur-Reply, ECF No. 44), and request for judicial notice in support of its sur-reply. For the following reasons, the Court denies Plaintiff's motion for preliminary injunction and denies Defendant's request for judicial notice.[1]

---

[1] The parties also filed several motions to seal various filings associated with the preliminary injunction motion. (*See* ECF Nos. 25, 29, 33, 46.) The Court will handle the motions to seal in a separate order.

## I.   INTRODUCTION

Plaintiff provides technology and consulting services in the retail energy market. (MPA 1.)  Specific to this case, Plaintiff has developed a product suite called inRetail Energy Transaction Suite ("inRetail" or "Platform") which provides software applications for energy suppliers managing their businesses; databases of market intelligence; and consulting services for regulatory issues, market strategies, renewable energy solutions, financial evaluations, and comprehensive retail market operations.  (*Id.* at 2.)

The Platform reportedly embodies Plaintiff's "unique way" of taking "complex retail transactions" and presenting them at a "very granular information level."  (*Id.*)  The technology collects, cleans, aggregates, and delivers market and operational data that retail energy suppliers use to stay informed on industry-specific information, manage their business, and monitor market changes.  (Decl. of James P. Dibble in Supp. of Mot. ("Dibble Decl."), ECF No. 24-1, ¶ 4.)  For example, Platform users can "create an offer for multiple products in a single deal while separating and managing the financial and volumetric aspects of the transaction discretely, which allows suppliers to hedge, track and manage positions at a contract and/or portfolio level."  (MPA 2.)  Users can "discretely track and analyze each data set" and then enter the data into economic models to evaluate risk and generate strategic purchasing plans.  (*Id.* at 2–3.)  Users can also view their "energy consumption and spend" and analyze transactions. (Dibble Decl. ¶ 4.)  Plaintiff states that the Platform's capabilities are accomplished by Plaintiff's "proprietary source code, architectures, process flows, collection techniques, reports, and user interfaces" found "nowhere else in the industry" ("Alleged Trade Secrets").  (MPA 2–3.)  Plaintiff claims the Platform and the Alleged Trade Secrets contain "methods of data management and presentment" that are not generally known to or readily ascertainable by others in the retail energy sector, and therefore carry actual and potential independent economic value to market participants.  (*Id.* at 3.)  Plaintiff uses reasonable measures to protect the Platform and the Alleged Trade Secrets, including confidentiality agreements with its employees, personnel, vendors, supplies, customers, licensees, and other third parties.  (*Id.*)  It also

uses "industry standard physical and electronic security measures in its facility and in connection with its electronic systems." (*Id.*)  The most sensitive development work is shared internally on a "need to know" basis.  (*Id.*)

Defendant is a retail energy supplier that serves commercial, industrial, and institutional customers across the United States.  (Opp'n 3.)  It has licensed the Platform from Plaintiff since 2005.  (MPA 4; Opp'n 3.)  Defendant claims to have contributed to the Platform's development over time, (Opp'n 1), which Plaintiff contests.  (*See* Reply 5–6.)

On June 10, 2005, Defendant began licensing an early iteration of the inRetail software to analyze American and Canadian power markets for internal use ("First Agreement").[2]  (MPA 4; Opp'n 3.)  Per the First Agreement, Defendant retains ownership of "[a]ny pre-existing idea, invention, work of authorship, drawing, design, formula, algorithm, utility, tool, pattern, compilation, program, device, method, technique, process, improvement, enhancement, modification, development or discovery."  (Opp'n 6.)  However, Defendant cannot reverse engineer, copy, or prepare derivative works of the Platform or allow unauthorized third parties to use or access the Platform for any purpose other than an authorized use.  (MPA 4–5.)  The parties agreed to not share confidential information (which includes designs, drawings, models, data, documentation, source code, object code, diagrams, flow charts, research, development, processes, and procedures) or use the confidential information "in any way detrimental" to the other party.  (*Id.* at 5–6.)

On February 10, 2006, the parties entered another agreement, which had the same substantive provisions as the First Agreement,  for the purpose of developing a retail power pricing system later known as inRetail Pricing Pro ("Second Agreement").  (*Id.* at 6; Opp'n 3.)  According to Defendant, part of this second project involved converting Defendant's existing Microsoft Excel–based system and pricing and tariff models into a software application.  (Opp'n 3.)  Defendant reportedly uses inRetail Pricing Pro to incorporate

---

[2] While Plaintiff made the First Agreement with Defendant's predecessor-in-interest, Defendant is now party to the contract.  Accordingly, the Court will refer to Defendant as the contract party.

3

25cv2796 DMS (BJW)

Defendant's methodology for pricing models, price quotations, and prices for its customers. (*Id.* at 4.) Defendant owns inRetail's data inputs (e.g., Defendant's customers' usage data and historic pricing data) and outputs (e.g., pricing quotes and models designed for Defendant's customers). (*Id.*)

Before 2008, Defendant also used Excel spreadsheets to generate reports on customers' risk exposure. (*Id.*) Defendant developed mathematical formulas and risk models embedded in its Excel spreadsheets. (*Id.*) The spreadsheets then visualized customer data with graphs and charts and were emailed to the customers. (*Id.*) Around 2008, Defendant decided to replace its Excel spreadsheets and email system with a "customer-facing" software application. (*Id.* at 1, 4.) Defendant wanted a web-based application that would pull data from inRetail and Defendant's databases, incorporate Defendant's existing tools and specifications, and present that data and information to its customers in a user-friendly format with enhanced graphics. (*Id.* at 4.) Defendant reportedly introduced the idea to Plaintiff and asked Plaintiff to develop the source code for the application which became known as PowerFolio. (*Id.* at 5.) Defendant claims to be "integral to the design and development of PowerFolio," by providing the specifications and functional requirements of the application, its pre-existing models and math underlying certain functions, and the "look and feel" of PowerFolio, including the user interface of the customer portal. (*Id.*) Defendant's purported contributions included visual mockups and instructions on enhancing the application throughout the years. (*Id.* at 5, 6.) Plaintiff claims that it had an existing product that already included many of the functions Defendant desired, which eventually became PowerFolio. (Reply 5.) Plaintiff also claims it performed the development of PowerFolio on the condition that the product would remain Plaintiff's intellectual property. (*Id.*)

On November 17, 2015, Plaintiff and Defendant amended the Second Agreement to address the development of PowerFolio ("Amendment"). (Opp'n 6.) The Amendment conveys to Defendant common law trademark rights in the "PowerFolio" name. (MPA 8; Opp'n 6–7.) Plaintiff claims that the Amendment conveyed only the PowerFolio name,

but Plaintiff otherwise retained in full the right, title, and interests in the Platform. (MPA 7.) Defendant contends that the Amendment affirms that Defendant owns its inputs to PowerFolio, including all data used in connection with PowerFolio, and select formulas, formats, and user interfaces. (Opp'n 7.)

Plaintiff reports that a whistleblower revealed Defendant is working on a project, called "PowerFolio3D Project Rebuild: Web Application" ("Rebuild Project"), to replicate the Platform "by analyzing and copying the Alleged Trade Secrets and other confidential information." (MPA 8.) Defendant allegedly disclosed the Platform, including the Alleged Trade Secrets, to a third party—Plaintiff's competitor and an unauthorized user—and requested that the third party reverse engineer the Platform. (*Id.*) Defendant is also allegedly reverse engineering Plaintiff's pricing system, which is contained in the Platform. (*Id.* at 17.) As part of this scheme, Defendant's employees were asked to bring an "existing Intelometry report to a meeting to enable [Defendant] to write [Plaintiff's] pricing system." (*Id.*) Plaintiff claims this project is "duplicating nearly every aspect" of the Platform— similarities include the page headers and virtually identical tables, charts, and graphs. (*Id.* at 8–16.) Plaintiff alleges when it asked Defendant to cease and desist the Rebuild Project, Defendant's CEO stated that there was no such active project. (*Id.* at 17.) The whistleblower informed Plaintiff that these statements were false—the project remained ongoing at the time of this call. (*Id.*)

Conversely, Defendant reports that it decided to build an alternative to PowerFolio in September 2025, because Plaintiff planned to replace the inRetail software with a new platform, but it did not have a solution to connect the new product with the PowerFolio application. (Opp'n 7.) This may make PowerFolio unusable, much to Defendant's detriment. (*Id.*) Thus, Defendant provided documentation, including screenshots, of PowerFolio's user functions to potential consultants and told them any project to replace PowerFolio had to be from scratch. (*Id.* at 8.) According to Defendant, no third-party developer would have access to any underlying source code, and Defendant did not provide the potential consultants with PowerFolio's source code. (*Id.*)

25cv2796 DMS (BJW)

Plaintiff now moves for a preliminary injunction "to halt [Defendant's] misappropriation of [Plaintiff's] trade secrets and confidential information until this dispute can be resolved at trial." (MPA 1.) Defendant has ceased all work with the potential third-party consultants who were provided the documentation of PowerFolio's functions pending the outcome of the motion. (Opp'n 8.)

## II.    LEGAL STANDARD

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "A party seeking a preliminary injunction must meet one of two variants of the same standard." *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017). Under the *Winter* standard, a party is entitled to a preliminary injunction if it demonstrates (1) "that [it] is likely to succeed on the merits," (2) "that [it] is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in [its] favor," and (4) "that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "A plaintiff must make a showing on *all four prongs* to obtain a preliminary injunction." *A Woman's Friend Pregnancy Res. Clinic v. Becerra*, 901 F.3d 1166, 1167 (9th Cir. 2018) (internal quotation marks, brackets, and citation omitted).

Under the Ninth Circuit's "'serious questions' test—a 'sliding scale' variant of the *Winter* test— . . . a party is entitled to a preliminary injunction if it demonstrates (1) 'serious questions going to the merits,' (2) 'a likelihood of irreparable injury,' (3) 'a balance of hardships that tips sharply towards the plaintiff,' and (4) 'the injunction is in the public interest.'" *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024) (quoting *All. for the Wild Rockies*, 865 F.3d at 1217). "[I]f a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips *sharply* in the plaintiff's favor, and the other two *Winter* factors are satisfied." *All. for the Wild Rockies*, 865 F.3d at 1217 (quoting *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)) (emphasis in original).

A plaintiff need only demonstrate success as to at least one of their claims to receive preliminary injunctive relief. *See Ozkay v. Equity Wave Lending, Inc.*, No. 20-cv-082630JST, 2020 WL 12764953, at *2 (N.D. Cal. Nov. 25, 2020). A district court may consider "the parties' pleadings, declarations, affidavits, and exhibits submitted in support of and in opposition to the [motion for preliminary injunction]." *Cal. Rifle & Pistol Ass'n, Inc. v. Los Angeles Cnty. Sheriff's Dep't*, 745 F. Supp. 3d 1037, 1048 (C.D. Cal. 2024); *see also Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) (finding district court did not abuse its discretion in granting a preliminary injunction when it relied on hearsay evidence and "the many exhibits, affidavits, declarations and factual allegations which have been submitted . . . by all parties . . . throughout the course of this litigation"). Any evidentiary issues "properly go to weight rather than admissibility." *Am. Hotel & Lodging Ass'n v. City of Los Angeles*, 119 F. Supp. 3d 1177, 1185 (C.D. Cal. 2015).[3]

### III.    DISCUSSION

#### A. Likelihood of Success / Serious Questions

Plaintiff carries the burden of showing a likelihood of success on the merits (or alternatively, showing "serious questions going to the merits"). *See A Woman's Friend Pregnancy Res. Clinic*, 901 F.3d at 1167; *All. for the Wild Rockies*, 865 F.3d at 1135. Plaintiff argues that it "has a high likelihood of success on the merits, and at the very least there are 'serious questions going to the merits'" on the federal and state trade secret misappropriation claims and breach of contract claim. (MPA 18–19.)

1. Trade Secret Misappropriation Claims

Plaintiff brings trade secret misappropriation claims against Defendant under the

---

[3] Prohibitory injunctions (i.e., preventing a party from taking action) are evaluated under the traditional *Winter* test, while mandatory injunctions (i.e., requiring a party to take an affirmative action) are subject to heightened scrutiny. *See Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009). The injunction sought here—ordering Defendant to stop the Rebuild Project—is prohibitory, because such an injunction prevents Defendant from taking an action. *See Kimsey v. City of Sammamish*, 574 F. Supp. 3d 911, 917–18 (W.D. Wash. 2021). Thus, the traditional *Winter* test applies.

25cv2796 DMS (BJW)

federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, and California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426 *et seq.* Both require Plaintiff to show that (1) it possessed a trade secret; (2) Defendant misappropriated the trade secret, and (3) Defendant's conduct damaged Plaintiff. *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 845 (N.D. Cal. 2019), *modified in part,* No. 5:18-CV-07233-EJD, 2019 WL 5722620 (N.D. Cal. Nov. 5, 2019) (citations omitted).

Plaintiff's burden includes showing that the information at issue constitutes trade secrets. *See Agency Solutions.Com, LLC v. TriZetto Grp., Inc.*, 819 F. Supp. 2d 1001, 1015 (E.D. Cal. 2011) (citation omitted). "A 'trade secret' is information that (1) derives independent economic value, actual or potential, from not being generally known to, or readily ascertainable by other people who can obtain economic value from its disclosure or use and (2) is subject to reasonable efforts to maintain its secrecy."[4] *WeRide Corp.*, 379 F. Supp. 3d at 845–46 (citing 18 U.S.C. § 1839(3); Cal. Civ. Code § 3426.1(d)). To establish the existence of a trade secret, a plaintiff "need not spell out the details of the trade secret," but must first "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." *TGG Mgmt. Co. Inc. v. Petraglia*, No. 19-CV-2007-BAS-KSC, 2020 WL 209103, at *3 (S.D. Cal. Jan. 14, 2020) (citations modified); *WeRide Corp.*, 379 F. Supp. at 845 (citations omitted).

Defendant argues Plaintiff failed to describe the Alleged Trade Secrets with sufficient particularity. (Opp'n 15.) The Court agrees. "A description of the category, or even of the subcategories of information within a category, does not comply with the requirement to identify the actual matter that is claimed to be a trade secret." *Soc. Apps, LLC v. Zynga, Inc.*, No. 4:11-CV-04910 YGR, 2012 WL 2203063, at *4 (N.D. Cal. June

---

[4] The DTSA and CUTSA share nearly identical definitions, except the CUTSA does not include the "readily ascertainable" language. Cal. Civ. Code § 3426.1(d).

14, 2012). Here, Plaintiff defines the Alleged Trade Secrets as the Platform's "proprietary source code, architectures, process flows, collection techniques, reports, and user interfaces." (MPA 3.) Plaintiff has not identified a specific file name, source code line numbers, or a process shared with Defendant, such that it has properly identified a trade secret. *See Nifty Techs., Inc. v. Mango Techs., Inc.*, No. 24-CV-194 JLS (AHG), 2024 WL 4230486, at *9 (S.D. Cal. Sept. 17, 2024). Plaintiff has offered only "the most general concepts to describe what it believes is its trade secret information." *Zynga, Inc.*, 2012 WL 2203063, at *5. This is insufficient to tie the Platform's described capabilities—a "unique way" of taking "complex retail transactions" and presenting them at a "very granular information level," (MPA 2)—to a "tangible trade secret material." *Nifty Techs., Inc.*, 2024 WL 4230486, at *9 (citation omitted). Plaintiff submits as evidence a 172-document reportedly shared by Defendant to a third party, titled "PowerFolio3D Website Documentation" ("Rebuild Report"), that "discloses volumes of content copied directly from the PowerFolio platform, including the design and content of user interfaces, explicit details about how user interfaces link to one another, and the general process flow and topology of the entire platform—effectively providing a blueprint to" the PowerFolio system. (Reply 1.) However, Plaintiff failed to provide sufficient "evidence indicating why certain information in the documentation is unique, how it differs from other presentments of information generic to the industry, or how it reveals anything with respect to the underlying processes that make PowerFolio work." (Sur-Reply 7 (emphases omitted).)

Further, many, if not all, of the Alleged Trade Secrets cannot constitute trade secrets. Plaintiff argues that the Platform's "presentment" is "different from, and not generally known to or readily ascertainable by, others in the retail energy sector." (MPA 6.) However, presentments, including reports and user interfaces, are not trade secrets because they are "evident to any member of the public that uses the program." *See Agency Solutions.Com, LLC*, 819 F. Supp. 2d at 1021; (*see also* Opp'n 20.) The examples provided in Plaintiff's motion—screenshots of page headers, tables, charts, and bar graphs—appear

to "contain generic website functions and data presentments." (Opp'n 20.) Specifically, the page headers are a row of six boxes with common names in the energy retail sector (or commonly known for websites/applications) such as "home," "meters," "trends," and "report." Additionally, the "Menu" design (found under Section 2.2 of the Rebuild Report) is a "key component to the unique *user* experience that PowerFolio creates." (*See* Reply 6 (emphasis added).) Menu options—which are seen and accessed by a user—are generally known or "readily ascertainable through reasonable means." Additionally, it appears the information and instructions contained in the Rebuild Report are related to presentment information and user interfaces that are generally known or readily accessible. Indeed, Plaintiff argues that the Rebuild Report "discloses volumes of content . . . including the *design and content of user interfaces*, explicit details about how *user interfaces* link to one another, and the general process flow and topology of the entire platform." (Reply 1 (emphases added).) The "Scope" of the Rebuild Report is defined as "limited to the user and functional requirements for the current PowerFolio3D Web Application." (Dibble Decl., Ex. E, Rebuild Report, ECF No. 26-1, at 3.) Thus, even if Plaintiff proved that it owned the presentment and user interface information—which Defendant strongly contests—this sort of information cannot constitute a trade secret.

Some of the Alleged Trade Secrets could constitute trade secrets notwithstanding the lack of particularity, such as the Platform's source code. However, assuming Plaintiff established the source code was a trade secret, Plaintiff does not provide sufficient evidence of misappropriation. "'Misappropriation' means acquisition of a trade secret through means that the party knew or should have known were improper, such as theft or breach of a duty to maintain secrecy." *WeRide Corp.*, 379 F. Supp. 3d at 846 (citing 18 U.S.C. § 1839(5); Cal. Civ. Code § 3426.1(b)). Here, Plaintiff does not argue that the Rebuild Report contains a source code. Defendant contends that it does not have access to this code and has not attempted to distribute the code. (Sur-Reply 3) Plaintiff has not provided sufficient evidence to prove the contrary. Nor has Plaintiff sufficiently established how providing a third party presentment information would or did lead to the acquisition of the

25cv2796 DMS (BJW)

source code.

Plaintiff also argues that Defendant is "working on a project to replicate or reverse engineer its pricing system (modules within inRetail)." (MPA 8.) Plaintiff submits as evidence an internal meeting invitation between Defendant's employees, titled "Pricing Application/RDS," which asks participants to "bring the existing Intel report that was referenced to see if it has all the data elements we would need." (Dibble Decl., Ex. G, ECF No. 26-1.) Plaintiff argues this shows Defendant is attempting to "rewrite [Defendant's] pricing system improperly." (MPA 17.) Defendant correctly argues that Plaintiff did not sufficiently show that Plaintiff attempted to reverse engineer inRetail. (*See id.*) Assuming the pricing system is a trade secret, the current record does not support Plaintiff's position that Defendant's "employees were asked to bring an existing Intelometry report to a meeting to enable [Defendant] to rewrite [Plaintiff's] pricing system improperly." (*Id.* at 13–14.) In other words, Plaintiff did not prove misappropriation. For the above reasons, Plaintiff has not sufficiently shown a high likelihood of success or serious questions going to the merits of its trade secret misappropriation claims.

### 2. Breach of Contract Claim

In California, "[a] cause of action for breach of contract requires proof of the following elements: (1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach." *CDF Firefighters v. Maldonado*, 70 Cal. Rptr. 3d 667, 679 (Ct. App. 2008). The parties agree that they entered into a contract; however, they disagree whether Defendant's actions—sending information relating to PowerFolio to the third party—constitutes a breach.

First, Plaintiff argues that Defendant's "ongoing efforts to replicate and reverse engineer the Platform," specifically inRetail's pricing system, plainly violates its contractual obligations. (MPA 18.) Similar to above, Plaintiff does not provide sufficient evidence that Defendant sought to reverse engineer inRetail's pricing system. (Opp'n 13.) While the calendar meeting invitation tells participants to "bring the existing Intel[ometry]

report that was referenced to see if it has all the data elements we would need," Plaintiff does not provide context as to what this report could be or why that would "allow Plaintiff to rewrite Defendant's pricing system." (*Id.* at 13, 14.) And while the Rebuild Report contains screenshots of PowerFolio's interface, Plaintiff does not explain how the Rebuild Report would allow a third party to reverse engineer the entirety of the Platform beyond a general assertion that it provides a "blueprint" to the PowerFolio system. The Court does not find a high likelihood of success or serious questions going to the merits under this theory.

Next, Plaintiff argues that Defendant's efforts violated its agreement that it would "not permit anyone to use or have access to the Software or any know-how, techniques, ideas, designs, concepts, improvements, discoveries, or algorithms, employed in the Software for any purpose other than the Authorized Use." (Reply 1.) Defendant argues that Plaintiff has not "seriously tried to show" that the information Defendant shared with the potential third-party consultant concerning PowerFolio belong to Plaintiff rather than Defendant. (Opp'n 11.) Defendant seems to argue because it "owns much of the relevant intellectual property," it had full ability to share with third parties the ideas, designs, and concepts it created and contributed. (*See id.* at 11–12.) The Agreements indeed demonstrate that Defendant contributed at least some "relevant intellectual property" and retained ownership of its "pre-existing invention, work of authorship, drawing, design, formula, algorithm, utility, tool, pattern," et cetera. (*Id.* at 6, 11.) However, Plaintiff argues that Defendant greatly exaggerated its role in the development of the Platform. (Reply 5–6.) Each side submits declarations from current and former employees to prove its respective position. The Agreements state that Defendant may not share, copy, or prepare derivative works of the Platform and will not give third parties access to the Platform, which includes PowerFolio:

> Neither the Company nor any of the Authorized Users shall, directly or indirectly . . . reverse engineer, attempt to reverse engineer, copy, modify, or prepare derivative works of the Software. Company hereby agrees that it will not permit anyone to use or have access to the Software or any know-how,

techniques, ideas, designs, concepts, improvements, discoveries or algorithms employed in the Software for any purpose other [than] the Authorized Use.

(Dibble Decl., Ex. A, ECF No. 26-1, at 1; MPA 4–5.) This provision does not place any limitations on the know-how, techniques, ideas, designs, concepts, improvements, discoveries or algorithms that *Plaintiff* owns. In other words, regardless of ownership, there is a possibility that the Agreements do not permit Defendant to share designs or concepts contained in the PowerFolio application. Similarly, the confidentiality provision broadly includes designs, drawings, models, diagrams, flow charts, and materials without limitation to those that Plaintiff owns. (MPA 5–6.) The Rebuild Report sent by Defendant contains multiple screenshots of the PowerFolio interface. (Dibble Decl., Exs. D, E, ECF No. 26-1.) Thus, based on this record, the Court finds there are serious questions going to the merits of Plaintiff's breach of contract claim under this theory.

**B. Likelihood of Irreparable Harm**

While the Court finds there are serious questions going to the merits of Plaintiff's breach of contract claim, Plaintiff "has not demonstrated any likelihood of irreparable harm." *Brandr Grp., LLC v. Elec. Arts Inc.*, No. 23-CV-02994-HSG, 2023 WL 4297571, at *3 (N.D. Cal. June 30, 2023). Plaintiff argues that it faces "[i]ntangible injuries, such as loss of intellectual property rights, damage to business goodwill and ongoing business development efforts," which are not "easily remedied by money damages." (MPA 20.) However, "preliminary injunctions are rarely issued for breach of contract claims." *Brandr Grp., LLC*, 2023 WL 4297571, at *3; *see Telephia Inc. v. Cuppy*, No. C 04-03508 SI, 2005 WL 588441, at *3 (N.D. Cal. Mar. 11, 2005) ("[A] claim for breach of contract can be compensated by money damages, and does not warrant the issuance of a preliminary injunction."). Thus, assuming the Court finds these harms were likely to occur, "injunctive remedy would nonetheless be unavailable in this court because the harm arises from breach of contract, not trade secret misappropriation." *Agency Solutions.Com, LLC*, 819 F. Supp. 2d at 1031. Plaintiff therefore fails to meet the second *Winter* factor as to its breach of

25cv2796 DMS (BJW)

contract claim.

Considering the above and based on the current record, Plaintiff fails to meet all four *Winter* factors for its trade secret misappropriation claims and breach of contract claim. Accordingly, the Court must deny preliminary injunction relief. *A Woman's Friend Pregnancy Res. Clinic*, 901 F.3d at 1167 ("A plaintiff must make a showing on *all four prongs* to obtain a preliminary injunction.").[5]

## IV. CONCLUSION AND ORDER

In sum, the Court **DENIES** Plaintiff's motion for preliminary injunction and **DENIES** Defendant's request for judicial notice. Further, the Court previously tolled Defendant's responsive pleading deadline pending the outcome of this motion. Defendant will **FILE** its responsive pleading within **fourteen (14) days** of entry of this Order.

**IT IS SO ORDERED.**

Dated: April 6, 2026

Hon. Dana M. Sabraw
United States District Judge

---

[5] Because the Court did not rely on the exhibits to the sur-reply when deciding the motion, the Court **DENIES** Defendant's request for judicial notice as moot. *Mikulsky v. Noom, Inc.*, 23-cv-00285, 2024 WL 251171, at *2 n.2 (S.D. Cal. Jan. 22, 2024) (denying the defendant's request for judicial notice of a privacy policy because the Court's analysis did not rely on that policy). The Court also **OVERRULES** the parties' objections to the declarations.

25cv2796 DMS (BJW)